We will hear first from counsel for one of the objectives. We have a situation here where we'll be hearing from several people on the side of the appellants and several people on the side of the appellees. I believe it's Mr. Bachrach. Your Honor, John Pence on behalf of the appellant. You have been reordered from the minutes that we've been given by the court's office. Who will follow you, Mr. Pence? I believe Jan Westphal on behalf of Kendrick Jan. All right. And then Mr. Bachrach, bringing up the rear. All right. Thank you very much. With the court's permission, I'd like to reserve two minutes for rebuttal. Granted. Your Honor, this case presents a clear violation of the principle announced by this court in Lindy 2 back in 1975, that the percentage of attorney's fees paid by a subclass must be proportional to the percentage of total benefits received by that subclass. In Lindy, one subclass was receiving 27.8% of the benefits, but they were required to pay 81.6% of the total fees. Here, the FSP subclass received 45% of the total benefits, but they have been required to pay 82% of the total fees. Lindy 2 requires reversal. Let me try to home in on a broader issue here, if I may, Mr. Pence. And this is a complicated case in terms of some of the issues having to do with the allocation and the distribution to the two subclasses. But this question goes to part of the payout to the IN subclass, and that is the valuation, the per unit valuation of the Pence. And assuming that the district court did not actually abuse its discretion in adopting the 10 cent per unit valuation there, what does the Boeing Company versus Van Gemert case do, if anything, to help us? And it suggests that we shouldn't require the court to consider a likely redemption rate of the Pence here by the class members, or is there some other way we ought to be going about valuing these? Well, Your Honor, you're correct about that, and the District of New Jersey has followed that methodology. Irrespective of CAFA, in the Fitzgerald case, which I believe involves CLE courses, the court said that it was going to value that settlement based on the number of CLE courses actually redeemed or taken by the attorneys there who were eligible for them. And it turned out that only $50,000 worth of the CLEs were claimed when the total amount available was in the millions of dollars. Of course, there they knew how many had availed themselves. Here, we've got a two-year period to use these units. What's a district court to do? Well, I guess there are two things the court could do, Your Honor. It could try to project a likely redemption rate based on past experience in other cases. It could go to the actual features of these pens, such as observing that their primary benefit in this age of texting and smartphones would be using them to call overseas, because I believe they were usable for international calls, at least at the time they were issued. The terms and conditions, of course, are subject to change at the end of IET. We know very little about how these would be used, whether they are useful. We know that the court relied upon the experts saying, well, given the marketplace, these are priced about right. But if the court has to understand what the benefit is, did it have to entertain or seek out expert testimony as to are these things worth anything to anybody? Well, I believe the objectors did raise significant doubts about that by pointing out that, number one, this class is over 10 years old. I mean, the class ended in 2006 at a time when people used their cell phones to make telephone calls. Just the passage of time in the age of this litigation would affect the market value of the calling cards, right? Correct, yes, Your Honor. So, I mean, I don't use them, so I have very little concept of how much they're used now, but there's a suggestion that they are used more by residents in this country of other countries. Correct. But I assume you would agree they're not valueless, that they are not without some market value, but rather that the district court here, according to your position, would have to be that they overvalued it at $0.10 per minute, right? Well, certainly they have some value, Your Honor, because Verizon paid something to IDT for them. That's the market value, and that's the best evidence. After that, it occurred to me, well, wouldn't it be important to find out how much Verizon paid to get them in the first place? And I gather the district court wouldn't let you make that inquiry. That's right, Your Honor, and the district court wasn't interested in learning that. And there's nothing anywhere else in the record to suggest that figure is there or that amount? No, there is not, Your Honor. I used the figure $2 million in my brief. That was merely an assumption based on the valuation that I found on the website on the day before the hearing, that these pins are valued at approximately $0.01 per minute, a tenth of the value that class counsel's expert assigned to them. There was no valuation, by the way, prior to the time notice went out, but as soon as the objectors objected to the valuation of the pins and challenged that, then Mr. Quodogno filed his declaration. So the 10 cents was negotiated, and we don't know on what basis. Well, I don't know that it was negotiated, because at the fairness hearing, Verizon said that they do not agree with the valuation. They take no position on it. I don't see why you would be – they also said something else. They said valuation was only relevant to attorney's fees. So I don't see why they'd be negotiating with class counsel about the value of pins when the only impact of the pins on the settlement is how much of the cash is going to class counsel. That's the only impact. They would be negotiating on how much they had to provide in pins, depending on how much they had to pay for them, I would guess. But then the value put on them afterwards – Class counsel leveraged the pins to maximize their fees. That was their primary interest. And remember, the pins are intended to compensate the in-network class members for uncontested claims. Yeah, the FSP class gets nine, right? These were claims that Verizon was not contesting. They called them random errors, and anybody who came to Verizon and said you overcharged me for calls within my network got 100% refund, reimbursement. Now all these claims have been liquidated for a fraction of their value in in-kind reliefs that may not be of use to almost anybody. Do we have a coupon here, and does it matter? I believe that's what Mr. Baccarp will be speaking about, the definition of these pins under CAFA. But I agree that they are more like a coupon than cash, certainly. On the continuum, they're much closer to a coupon. And, of course, Judge Posner has said it doesn't matter how much of a discount you get. Even if it's 100%, it's still like a coupon. You talked, though, about the delay in really evaluating the coupons, and there would be an imposed delay if they had to be redeemed. Is that unjust for counsel waiting for their attorney's fees? No, Your Honor. I would suggest that you only delay for perhaps three or four months, then look at that redemption data and project it out. Most people are going to use these pins, if they're going to use them at all, as soon after they receive them. That's Judge Posner's view. And maybe partial payment, you pay some now and then wait for the four or six months. Right, or the stage leave fees. Yes, Your Honor. If I may, I'd like to turn back to the issue of the disproportionate attorney's fees here, because my allocation argument basically assumes that the pins have the value that class counsel assigned to them. I don't want that to be misconstrued as an agreement with that valuation, but even if they did have that value, this is still unfair to the FSP subclass. The other side has provided us effectively with a graphic demonstration of the allocation, which shows, as I recall it, an allocation resulting in the same cash payout to each member of the two classes, right? Correct, yes, Your Honor. Why are they wrong about that? What they did to come up with that 71, 29 percent allocation is they took the numbers as they resulted from the attorney's fee report. Well, they did in ex post. I agree with you on that, but I know they worked backwards, but I still don't know why it's wrong. Even if they worked backward, it may still be a correct thing. Primarily because it conflicts with the allocation order. It contradicts the settlement agreement. It wasn't disclosed in the notice. It doesn't appear in the court's opinion, and it doesn't appear anywhere in the record. They have no citation for that. They simply say, well, this is what we were thinking. We never disclosed it to the court or to the class members. If that were true, if there really were that kind of a disparate allocation, then we have a dewey problem, because we don't have separate adequate representation of the FSP subclass. I didn't object to that because it looked like a prorata allocation. Everybody gets the same amount of cash, which is what they ultimately did in dewey on remand. I know a little bit about dewey. I know you do, Your Honor. I listened to the oral argument two days ago. But the point here is they can't now spring this on the class and say, surprise, here's what we were intending to do all along, but we never disclosed it to you, the court, or anybody else. Even Verizon had no idea about this intended allocation. It's really their only option is to say that this is what they intended all along, because that's the way it ended up. With regard to the common fund doctrine, the entire fund vests in the class at the time of the settlement, and then fees are disgorged from that fund. Class counsel are trying to argue that the FSP class members only have a right to the net fund, their prorata share of the net fund, but in fact they have a right to the entire fund. And then class counsel, because they've been unjustly enriched, class counsel has a right to a reasonable percentage of the fund that they obtain on behalf of the class. So how are you saying, what do you propose in terms of the attorneys' fees? Well, there are two things that could happen here. Either the court could refuse to award any fees for the PIMS simply because they're not, it's not adequately confident in the valuation, and because 30 percent of the cash fund provides more than adequate. If there's a basic disagreement over the valuation of the PIMS, and this court were to agree on that, wouldn't it be best for this court to send the matter back to the district court and ask the district court to revisit the valuation issue, and then make determinations once again on the allocation? Yes, Your Honor. And if you do send it back for that valuation, I would also ask that you, in that opinion, address the Wendy 2 issue, which is that the FSP subclass cannot be made to pay any portion of the fees related to the PIMS, because that's the other problem here. There's no source of fees for the PIMS portion of this settlement. So you're suggesting that we hand out PIMS to counsel? Yes, that would test their argument. They said there's a secondary market. They said these things have cash value. That's not true. Let me know. That's why they won't take it. We'll explore that. We have overseas clients. Thank you. Ms. Westphal. May it please the court. Jan Westphal, 4, upon Kendra Jan. Briefly, just to address the question that you started off regarding Boeing v. Van Gendler, I think that case makes it very clear that the court must identify the beneficiaries of the settlement or the portion of the settlement, accurately trace the benefits that would be going to those beneficiaries, and then shift the fee to them. And that's why the payment of fees from the cash component of the settlement for the non-cash component cannot possibly be fair to the FSP class. The allocation orders only allocated the settlement pro rata between those two classes and did not assign a portion of the fees to be paid from the non-monetary portion. So it's the non-monetary portion. That is not erroneous or wrongful per se, is it? I mean, we grant, and in class actions perhaps more than any other area, vast discretion to district judges. And that discretion plays out very much in the settlement area and the approval of settlements and ultimately the allocation of them and the fees that are determined. So you wouldn't be suggesting that it's inappropriate in every case to place a market value on some in-kind good or service, make that part of a settlement, are you? No, that's not. Are you suggesting, are you, that it would be inappropriate in those cases to, in every case, determine a fee and have the fee paid out of the common cash fund, not requiring that there be some payment to counsel of some portion of the in-kind amount? I mean, that wouldn't be the case, would it? No. So, you know, I think there are a couple of different ways to look at the error here. One is that we believe the court did not exercise the kind of independent economic judgment needed to assess the pin value and to put a price on that component of the settlement. The other side of the question is that we have two separate classes who have a right to recovery to the cash. They did not have separate representation. They did not have either legal representation or class representatives. That's the Dewey problem. The Dewey problem. And the court did not recognize that by paying fees entirely from the cash recovery, which 82 percent should have gone to the FSP class, that it was disadvantaging them vis-à-vis the in-network class. And one way to look at this, I believe, Your Honor, is to look at what would happen if the court were to change the attorney's fees. Because if the court had awarded 25 percent of attorney's fees, then the allocation between the classes would have changed. But you're never going to have the coupon class paying fees. I mean, the money's always going to have to come from the cash, is it not? Right. But so what the court has to do ahead of time is to decide, is to allocate those benefits. And why should 82 percent go to the SFP class? Because numerically they had 82 percent as a class. But it's not as simple as numbers, is it? In fact, in settling this matter, the defendants denied liability effectively. They challenged, they contested the FSP class, didn't they? Yes, they did. They vigorously contested it. Right. Not so with respect to the IN class, right? That is correct. So risk could certainly be a factor, couldn't it? I agree, Your Honor. The court could certainly have allocated. It could have determined that these classes are entitled to different damages. But one way to look at it, what class counsel is suggesting is looking at it after the fact. The initial step of allocation has to come before the award of fees. So, yes, the court could have done that. We got that, Ms. Westphal. And, again, because of the multiplicity of counsel here arguing for the objectors and the time constraints we've placed on it, we'll have to ask you to close. Thank you. Which brings us to Mr. Bacharach, who I thought had first stepped to the podium, because that's what my list says, but this is the real Mr. Bacharach. This is, in fact, the real Mr. Bacharach. And may it please the court, I'm here for the objector appellant, Michael Reines. I thought a minute ago, while I was listening to Mr. Pence, that I should start by pointing out that I can misquote Justice Potter Stewart and say that I can't define what a coupon is, but I know I'm going to see one. And these are coupons. What do you make of the fact that Congress didn't give us a definition? Well, Congress is Congress, and this is what they could make with their sausage maker out of the competing interests that they were dealing with when they passed it. The district court said it's not a coupon because it doesn't call for a continued relationship with the entity. In other words, it's not ten cents off more Verizon minutes or something like that. You think that's a measure of what a coupon is? I think that what a coupon is is a balancing test. Or a many-factor inquiry. That's, I believe, saying it's a balancing test, but yes, it's a many-factored inquiry. I'm sitting with two judges, two colleagues, who are very proficient in the French language, and coupon is a French word, and yet I tried to find some etymological assistance in what a coupon ought to be, and it helped me not at all. Maybe they can help me, but we have no definition. We have a word. Essentially, the word tells us no more than the paper thing that we're dealing with, but that doesn't help us with congressional intent. And I don't think that anyone seriously thinks that was congressional intent. Well, the Senate report has numerous, for examples, and they all are 5% off, 5% off, 10% off on something where it's either, you know, and we get to Posner, is it a discount or a voucher? And yet this doesn't seem like cash to me, but I'm just wondering why is it a coupon? Well, I was about to say, if you back up in CAFA to why Congress says they pass it, they say counsel in class actions awarded large fees while leaving class members with coupons and or other awards of little or no value. So I think that although Congress didn't say take that as a definition of coupon, I think that what Congress really intended was that a coupon is something of little or no value that you give to a class so that when you ask the district court for attorney's fees, you can claim that the value of the settlement, it grossly exceeds the actual value, which is the cash money. Congress didn't get to the point where they said that all coupons were valueless. They just said that they're of dubious value. And so a district court should not award attorney's fees based on the coupon value. So isn't it helpful then to consider factors like, first of all, is this nothing more than a coupon that provides us or provides the class member with a discount as opposed to some in-kind provision of a whole or entire good? Isn't that an appropriate factor in the absence of a definition? It would be if we actually knew that the class was getting a discount at $0.10 a minute. I'm using that as an example. That's not our case here. One could easily argue that what has been provided is a good or service in its entirety, not one for which it discounts. A minute is a minute. Well, the value of the minute is the question. A discount is conditional. I mean, a coupon is conditional, is it not? I mean, we're talking about there has to be some – it is conditional in some further context, some further transaction. Is that an important part of the definition? Yes. An important part of the definition is that the coupon to the class member is of limited value because it's going to be used with regard to – Unless there's a secondary market for it. I would postulate, Your Honor, that as old as I am, I'm entirely sure there's no secondary market for minutes in 2016. That would be my assumption, but I'm probably your age or so, and I don't know. But if this were $10 to use at Starbucks, let's say, instead of $0.10 a minute, would that be – under the case law, I don't think that would be a coupon. Well, if Starbucks was the defendant. It's like cash. Not if you don't want to go to Starbucks anymore. Let me ask another question. We want it to be a coupon because then we're under CAFA, and we have to look at the redemption. Would that be correct? Yeah. But if it's not under CAFA, we still could do what – or say to the district, do what the judge did in the Fitzgerald case, Judge McNulty. And, you know, if you're going to figure out what this is worth, we need to know whether these are going to be redeemed or not, whether they're going to be used. So do we end up in the same place? You should end up in the same place because the duty of the district court and the reviewing appellate court is to act as a fiduciary for the class in the sense of making sure that the deal – We've never said that the appellate court is a fiduciary for the class. We and other circuits have said district judges are fiduciaries for the class. Necessarily because of their position vis-à-vis the class. I understand that no one says that, but if the appellate court is reviewing the district court order to look to see whether it's fair to the class – We're out of time, but let me just make it very clear that there's not a single court in the land that has ever said an appellate panel acts as a fiduciary for the class. Virtually every circuit in the country has said the district court is a fiduciary for the class. Thank you very much, Mr. Bacharach. We'll hear from Mr. Weissman on behalf of Selco Partnership. You're the first on the list, according to me, but if that's not the order, correct me. That seems to have been the course of events today. Our list has not coincided with counsel's notions. Good afternoon, Your Honors. May it please the court. My name is J. Paul Janak, and I counsel for the plaintiffs. You're definitely not Mr. Weissman. I definitely am not. With the court's permission, Mr. Weissman and I discussed and decided it probably would make sense for me to go first in view of the issues that were discussed by the objectors. That's fine. I think I will probably start by addressing the issue of coupons, which is the last issue that we started with, and explain why, in our view, these are not coupons, and there are two fundamental reasons for it. When you think of coupons, basically, as Judge Roth had indicated, you think of something where you have to pay something to somebody in order to get a discount. Help us, if you will, with how we should write an opinion, if that's what it came down to, that in the absence of a statutory definition of a coupon, what in light of congressional intent, as we can glean it from legislative history, is a coupon? Well, I think as Judge Rendell was mentioning, based on reviewing some of the legislative history, the concern of Congress was that class members in a settlement would be given non-cash benefits for which to exercise them. They had to do business, again, with the same defendant. So it would require a continuing relationship. A continuing relationship with the same defendant. So that's a factor. That's a factor. Next factor, does the class member have to spend additional money in order to realize the benefit of that coupon that is given to the class member? For example, GM trucks, $500 off if you buy another truck. So I think those are the two hallmarks of a coupon. And then if you just step back and look at it practically, in terms of the coupon that you cut out of the newspaper, the Sunday paper, it requires you to do business with a specific entity and it requires you to spend money in order to get a discount. To me, that's the hallmark of a coupon. But there are many coupons that I don't cut out of the Sunday newspaper because they're not worth anything to me. And if the benefit that's provided is of this sort that is not worth really anything to the people receiving it, isn't that the type of situation that Congress was concerned about in CAFA? That was an additional concern of Congress, but that doesn't really apply here. And the reason for that is these PINs, which are what we refer to as in-kind benefits, are being given to a class, the in-network class, whose crux of their claim was that they were deprived of minutes. It's a way of restoring minutes to the class that was deprived of minutes. These PINs are also very useful as a coupon. Congress has, for the most part, gotten access to those minutes through the way that contracts with cell phone companies are created these days. You have unlimited minutes. So how can you benefit them by giving them minutes when they don't need minutes? Well, you can benefit by using those minutes to place international calls, for example. But why does nobody want overseas? Well, I mean, for you, the class member that receives one of these PINs, doesn't know anybody overseas. And there's no secondary market. There is a secondary market. Yes, there is a secondary market. There is a secondary market. Describe it. Our expert, Peter Quadagno, testified in his report that there was a secondary market for these units. And even though, I'll say for folks like us, it's hard to imagine using calling cards, right? It's hard to imagine using PINs. There is a market for them out there. Do I recall that the district court stated in its opinion that there was a secondary market? The district court did say that, yes. So is that a factual finding? That's a factual finding. And it's based, in large part, on the evidence that was submitted, which was the declaration that we submitted. But we don't know what that market is. I guess if you assume there's a secondary market, you know, that the value is near what they're estimated at? In terms of who purchases them? Yeah. You have to go into the secondary market and find out. And for what amount? I mean, the fact that there's a secondary market doesn't mean, oh, well, these are automatically extremely valuable. No, it only gets you so far. You're still left, or we're still left with the inquiry as to what the valuation of the units are. Right. And I think we also have to add that not only is there a secondary market, but these are freely transferable. Okay. So, for example, Judge Roth, you can't use yours, but maybe you have a son or a daughter who knew somebody overseas. You can gift that to your son or daughter, and they can use it. I mean, I have a daughter that makes calls on Canada, and I see them on my cell phone bill. The units and the rates are subject to change without notice, and IDT may deny or limit the use of the PINs for any lawful reason. I mean, they're pretty flexible there. Right. There is some what we would probably refer to as exculpatory language in there. Yeah, that would be right. But I think the most important issue here is that with respect to the valuation that Judge Linares concluded was a fair and reasonable valuation at $0.10 per unit, that is subject. It's a factual finding. It's subject to an abusive discretion standard. And if we look at what happened in the trial court below, there was enough of an evidentiary record in order for the judge to make that factual finding. First of all, there's the declaration that was submitted by our expert, who has 25 years of experience in the, quote, unquote, calling card industry, knows how to value these cards. His testimony was that the permanent valuation of these cards was no less than $0.10 per unit, no less. Second of all, the defendants could have requested an evidentiary, not the defendants, pardon me, the objectors. They had the right to request an evidentiary hearing on the issue. There was only one objector showed up at the fairness hearing, was it? Well, actually, no objectors, but it was only Mr. Pence on behalf of one of the objectors, yes. They could have requested an evidentiary hearing. They chose not to do so. Just parenthetically, and I realize this is not exactly on point with what you're stating right now, but how many objectors were there or what proportion of objectors were there to the sum? There were nine original objectors. It was a small number, wasn't it? Very, very minuscule. I mean, it's .00 something percent, considering that there are 2.2 million class members. And that factored into the Gersh analysis. Absolutely, as did the fact that there were only 89 opt-outs of 2.2 million people, very, very small amount. Just returning to the evidentiary record, Mr. Jan submitted evidence, and I put that in quotation marks, but he at least said that there was a Vonage card out there that had lesser per-minute charges. But when we looked at that Vonage card, it also had a $28.99 connection fee at the very outset. Mr. Pence, on behalf of his client, Ms. Corser, submitted the night before the final approval hearing something that he printed out off a website that purported to show other available cards or pin units that were priced at a lesser per-minute charge. We went through, at the time of the final approval hearing, why those lesser per-minute charges were not indicative of the value of our pin because we went through all the small print and the other terms that applied to those cards. The judge had all of that evidence before him. He considered all of that evidence. He made a factual finding that the $0.10 per unit was fair and reasonable. It's a factual finding that's subject to an abuse of discretion standard. There was no abuse of discretion standard there, and there's a full evidentiary record to support it. Now, when you have a determination of factual… There was no Daubert hearing of any kind in this. There was no Daubert hearing. There was no objection made by any of the objectors to Mr. Cordanio's declaration. There was no attack on the methodology applied by the economic expert in terms of the valuation of the pins. We had no attack here in the district court on the methodology used by the expert to fix the value of the pins. No, none at all. The only other first time that an objection was raised would be by Mr. Jan in his opening brief on appeal. But, of course, that issue was never raised below and it's waived. But the expert opinion didn't get to the utility or usefulness or benefit. It really just compared other rates. So, I mean, you could have somebody do that with any kind of commodity, and yet you'd have no idea whether the commodity really was worth anything to somebody. Well, his expert report compared terms of other competing products. Well, he didn't acknowledge that the terms were subject to change here in his report. In his report? Yeah. Okay. He didn't, and that was important. He actually distinguished other plans where they were subject to change and discounted those. Right. But he certainly went through the fact that they were freely transferable, the fact that they were usable for two years, the fact that they didn't have any hidden fees. All of those things, he said, distinguished it from the other comparable products out there. And then he compared those products based on the permanent assessments, and he determined that ten cents, no less than ten cents, was fair and reasonable. And he also spoke to the issue of secondary market. Wasn't there a conflict of interest at that point between the two settlement classes in the evaluation of the PINs because that would affect the attorneys' fee and would affect then, as we have been discussing in the distribution to the two classes, what each class got. So at this point, in this type of settlement where there is differing interest between the two classes, didn't each class need representation? Well, each class had representation. This case is different, for example, from the Dewey case that Judge Smith is very familiar with. And the issue in the Dewey case that Judge Smith concluded was problematic, was that you had two groups as opposed to subclasses within one class. You had a disfavored group, which was called the residual group. And Judge Smith concluded, well, there's no representative for the residual group. All of the class representatives were part of the, what I refer to as a priority group, that had first priority dibs on the fund that was made available. Here we have Mr. Demick, who is a representative of the in-network class. We have Mr. Barth, who is a representative of the FSP or the overage class. So we have two separate class representatives. We also have two classes that have the same alignment in terms of what they wish to accomplish, which is to recover as much as they can of current damages. So we don't have the classic intra-class conflict. What about counsel for the separate subclasses? What about counsel for the separate subclasses? No, they shared the same counsel, but that doesn't necessarily create a conflict. But we all know class litigation is essentially lawyer-driven litigation. And all the academic literature reflects that as well as experience. So the mere fact that representatives act in their capacity, their representative capacity, doesn't really answer conclusively the adequacy question, does it? Perhaps not if you want to extend that adequacy issue and the need for separate representation of counsel into the allocation process, because that seems to me the only place it would apply in this case. Because at the settlement level, you had two classes that were perfectly aligned in terms of what they wanted to accomplish, which was to maximize their benefits. And a common fund was created and negotiated and obtained for the benefit of all the class members of both classes without there being any type of differentiation as part of the settlement as to who was going to get what. So that makes it very different, for example, from the Dewey case and from some of the other cases. And you did not have at all what I refer to as just the classic intraclass conflict, where you have part of the class, for example, in AmChem, Ortiz versus Fiberboard, and even in the payment card case, where you have part of the class that wants to recover for present harm, and you have another part of the class that's more interested in safeguarding against future harm. We don't have that here. So when we get to the allocation phase, first of all, there's no case that I've ever seen in the district court or in the Third Circuit that suggests that separate counsel is needed strictly for the allocation phase. Second of all, where do you end up drawing the line on that? Even within a class, every single class member has its own personal self-interest at heart in terms of wanting as much of that common fund as that class member can get. Are you going to require every single class member to have their own personal counsel? Because arguably, each class member has a conflict in terms of, I want the most money. You have a minute and a half. I have a minute and a half. I guess I will just address briefly the argument that is made primarily by Objector Courser but also by Objector Jan that has to do with them essentially arguing that the FSP or the overage class is bearing an unfair burden of the attorney's fees. We submitted a chart, which is on page 19 of our brief. On pages 17 and 18 of our brief, we outlined exactly how the plan of allocation flows through according to the allocation order. Page 19, we made a table that shows how at the end of the day, and it's just pure simple math, the settlement fund ends up being divided up on a percentage basis when you follow the plan of allocation order. And then, yes, we work backwards, but I don't like the word backwards. I like saying we work from the bottom up. And we determined that the allocation order resulted in 29.1% of the total settlement or the net settlement, either or, going to the FSP class and 71%, let's call it roughly 70%, going to the in-network class. And that table on page 19 shows if you start from the bottom and move up and arrive at that percentage and then take that same percentage and apply it to the gross settlement fund, which makes sense, and then if you walk it through, it shows that each side, each class, only bore its fair and respective and proportional amount of the attorney's fees and the expenses. And that's simple math. As long as it's simple math, I can probably be led to understand it. Thank you very much. Thank you very much. Mr. Weissman. May it please the Court, Henry Weissman of Munger, Tolles, and Olson for the defendant and appellee Selco Partnership doing business as Verizon Wireless. The key point I would like to try to convey to the Court is that the reasonableness of the settlement is separate and distinct from any questions that the objectors have raised with respect to the plan of allocation or the attorney's fees. And the District Court dealt separately with those and at length separately. Precisely. And there was no abuse of discretion in the District Court's finding that the amount that was paid in consideration for the releases in this case, which is what the settlement agreement is all about, was fair, adequate, and reasonable. The Court found that the cash consideration alone constituted about 50% of the damages claimed by those customers who were on the Vision billing system, which were the only customers that could be identified. I'm sorry. Go ahead. Go ahead. Just to say the PINs provided some additional value over and above the cash, but the Court did not need to quantify the value of those PINs in order to reach the conclusion that the settlement was fair, adequate, and reasonable. Why not? Because the Court found that the cash alone was a reasonable amount of compensation for the class. It was about 50% of the damages claimed. The Court said that is very fair and reasonable as consideration for the release that the class is giving. Whatever the additional value of the PINs is, he doesn't need to quantify that because the cash alone is sufficient to justify the release that is given. Now, I would emphasize a presumption of fairness applies in this case under Ware for Inn because the settlement was negotiated at arm's length. The settlement was reached after the classes had already been certified. There was a mediator who was involved. There were very few objectors proportionate to the amount of class members. And then under the Gersh factors, it's clear that the settlement was reasonable, taking into account all of the Gersh factors. I'll just briefly summarize and say that the defendants had some very serious objections and defenses that had not yet been resolved. For example, the only classes that had been certified on a nationwide basis were claims under the Federal Communications Act. The District Court had referred those to the FCC. That proceeding was ongoing with no end in sight. Then, if and when we came back from that, we had a motion to compel arbitration, raising somewhat similar issues to the ones that this Court heard earlier this afternoon. If that motion had been granted on an individual basis, that would have been the end of the class. If it had been denied, we would have had a right to an appeal. Can I go back on what you said that both Judge Smith and I said why? You said he's separate and apart from the pins, but when he was talking about the reasonable recovery, he said more than 40% of the $156 million in total potential damages, but that 40% included, that was the $64 million, that included the pins. Yes. Did it not? Your Honor is referring to page A-74. I am. Yes. If I might invite the Court's attention, however, to page A-68 and 69, where the Court rejects the arguments that the cash consideration is insufficient, given the scope of the releases, and finds that it is approximately 50%. The cash alone is about 50% of the value of the claims of the vision customers. So, yes, he also observed that the pins provided this additional consideration later in his opinion. Well, the cash alone of $36 million is not 50% of $156 million. The $156 million is both the vision customers and also the customers who are on a legacy billing system called I2K. Okay. And there was evidence in the record that because of the fact that system was no longer being used, those customers were not identifiable, as the District Court observed. So the relevant figure is the $73 million? Correct. Okay. And the cash is 50% of that amount. I see my time is running down. I did want to make two additional points. Let me ask you, and I'll give you the time to make those points, but I'm curious about the clear sailing provision, which is not unheard of in settlements. Why I'm curious is that if you have no state, no interest in the attorney's fee issue here, why do you even bother to provide a clear sailing provision? It was a redundancy in a sense, Your Honor, because by definition the whole concept of the common fund settlement and the whole way this thing was structured was we pay this consideration, we get the release, everything else is not our department's. Well, I mean, in theory one assumes that in bargain for exchange, all provisions of an agreement are there for a reason, and most, if not all, have some economic value. At least some of our colleagues, particularly in the Seventh Circuit, I assume would assume that. But, I mean, so you just used the word redundancy. I would explain it this way, Your Honor. From our point of view, the necessary implication of the structure of the settlement is that we had no interest in the fee. The plaintiffs wanted us to confirm that, that we wouldn't have any statements being made. You have an interest here, don't you? I mean, you have an interest here because if the fee is upset, it potentially upsets the whole settlement. No, it does not, Your Honor. Does it potentially upset the whole settlement? The way that we stated it in the settlement agreement and the way that the district court applied it and the way that other courts have validated it is that the determination of the fee is separate. Well, we said that at the outset of your argument here. I understand. All right. Indicate again. I do, Your Honor, with the Court's indulgence. Thank you. One point I wanted to make is that with respect to whether or not there was a conflict, as the Court has been inquiring in terms of the division of the consideration between the two classes, I would simply point out that whether or not the Court finds such a conflict, that would have no bearing on the validity of the settlement agreement because the interests of all the class members were perfectly aligned in negotiating the settlement agreement because the sole purpose there was to try to get as much consideration as possible on behalf of the classes. And I might be so bold as to invite the Court's attention to language in the Dewey case at footnote 15 where the Court said the representative plaintiff's incentive to maximize the aggregate size of the reimbursement fund is separate from their interest in allocating that fund amongst the class. So any issues with respect to allocation are separate from the reasonableness of the settlement itself. And I might say- You really don't want us to touch that settlement at all, do you? Yes, that's correct, Your Honor. That is the only reason I'm here. I flew all the way to Philadelphia to make that one point. I did want to also try to address the question that I believe Judge Roth raised, which was an inquiry about how much Verizon Wireless will be paying for the pens. And I have just a few points to make on that subject. And that does not appear anywhere in the record, does it? Correct. Because it was not raised. So any objection on this basis was raised. Well, that's interesting. Shouldn't it have been raised at least by the district court in his, as we have discussed just a little bit ago, fiduciary role in seeing that there was a fair and reasonable settlement here? No, because- I thought that would be your answer. Because what's relevant to the class is the value to the class, which is not the same as the cost to the defendant. And there is considerable case law- It's not at all relevant to that inquiry? No, because what's relevant to the inquiry is the direct testimony- Relevance is a very, very, very elastic concept. Fair enough. If this had been a discovery dispute, that might have been one thing. We could have thought that out. But to your question about did the district court have a duty sua sponte to inquire into the cost, given that he was presented with direct evidence in the form of an expert declaration attesting to the value to the class of the pins, he was not obligated sua sponte to make this inquiry- But it wasn't a value to the class of the pins. It was a relative value as compared to other pins that might be out there. But it didn't really talk about the value or benefit provided by the pins. It provided, I would say, a market value. So not everybody is necessarily able to avail themselves of, I'll say- If you look at the GM case and you look at the Redmond case, determining the value is more than just saying compared to other products of similar kind, it's the same. Well, I mean, if somebody gave $1,000 on a Ford truck or $8,800 on another truck, you'd say, oh, well, in GM it's really just the same value. That's not what we come down to. So as a friend of the court, since this is not my issue, I allow the following perspective. In our economy, goods and services have a value that is determined by the market, whether it's a functioning market. So here there is a functioning market for pins. Mr. Quidagno offered his expert opinion as to the value of these pins based on the existence of that market. Now, not everybody necessarily can avail themselves of that value. If you're not a wine aficionado, it may not matter to you what the market value is of a particular bottle of wine, right? But that wine nevertheless has a value, and it can be monetized by selling it if you're not interested in it. Same thing here. These pins have a value. It was estimated. Market value was estimated. And if a particular class member doesn't care to use it or has no use for it, they can transfer it by sale or gift. But in considering what the market value is, what Verizon paid for them I think would be a significant factor. Well, with all due respect, Your Honor, I would say, again, that was not raised. I don't think it was required to be raised sui sponte. But there is a difference between the amount that Verizon Wireless pays and what the market value is. Right. I realize that. Yeah, I realize that. But it's still instructive in thinking about what the market value is if there is a secondary market. If these things are floating out here, what are other people going to pay for them? And a big company can certainly buy them a lot cheaper. Sure. I could. Exactly. But in thinking about all that, there are a lot of different elements I'd like to put into the equation. If that issue had been raised, we could have litigated that question. And there is case law to suggest that the relevant inquiry is value, not cost. I would say in this particular case, I think the Court should hesitate to express a categorical statement about the obligation of the district court sui sponte to inquire into cost, given the factual context here, which was that there was direct evidence of that. Point well taken, except I assume you would concede that when we are in the class action context setting and we, in our own circuit jurisprudence, state, as other courts, just about every circuit has stated, that the district court owes a fiduciary obligation to the class. That provides some different reasons and incentives for a court to sui sponte engage in inquiry than a district judge would in other forms of litigation, doesn't it? Absolutely. And I think the Court's task is to determine whether, in this case, given the factual record, including the declaration that the district court abused its discretion in not undertaking that sui sponte. Thank you very much, Mr. Weissman. We'll have Mr. Pence back and brief rebuttal. Thank you, Your Honor. A few brief points. Number one, the appellants had no opportunity to rebut Codogno or his declaration because it wasn't part of the record until after the objection deadline. It wasn't out there long enough for the objectors to really study it and adequately rebut it or retain it. Did you ever ask for a hearing? No, we didn't, Your Honor. Couldn't you have asked for a hearing in the wake of receiving the expert report? Yes, Your Honor. It's a big deal. I could have filed a motion to put off the fairness hearing and have time to depose Codogno, to find our own expert, to discover what Verizon paid IDT. We do have an expert here. We do have someone who's already projected the redemption data, IDT. In coming up with a price to charge Verizon, I guarantee you they projected that they have experts in their company who know how many of these people are actually going to use these PINs, and that was reflected in the price charge of Verizon. That figure is reliable. That's the market rate. With regard to the subclassing, there was no separate counsel at the time of this allocation, at the time 71-29 was determined. That's precisely the time you need separate counsel. That's when it matters. It's not before when you're getting the whole pie. It's when you're chopping up the pie. And moreover, this 71-29 fiction, it's a lie. How could that be a true allocation intended by class counsel when, if the attorney's fees had been any amount lower, even 25% or 20%, then the entire allocation breaks down. It's not a piranha anymore. And Ms. Westfall and Mr. McDonald, who's sitting in the back, they put charts in their briefs that show how the allocation will change as the fee award goes down. It breaks down. The only number it works at is 30%. If that number changes to 29, now you have the in-networks getting more of the cash than the FSPs, and that's a violation of the allocation order. That's not what Judge Linares intended. Thank you, Your Honor. Thank you, Mr. Pence. We thank all of counsel, counsel for the objectors, counsel for the appellees, for the excellent briefing in the case and for their very helpful arguments here. A complicated, complicated case, a difficult case. We will, of course, take the matter under advisement.